## VIALLET v. CONSOLIDATED RY. & POWER CO.

No. 1606. Decided February 13, 1906 (84 Pac. 496).

1. CONTRACTS—UNDUE INFLUENCE—CONFIDENTIAL RELATIONS—PHYSI-CIAN AND PATIENT.—A confidential relation exists between physician and patient, which renders voidable a transfer for insufficient con-sideration of valuable property rights by the patient obtained by the physician by misrepresentation or other unfair means.

2. RELEASE—AVOIDING CONTRACT.—In order to avoid a release of a claim for injuries obtained by a physician from his patient by mis-representations, it is not necessary to show that the patient had full confidence in the judgment of the physician, but it is sufficient to show that the statements of the physician induced the making of the release, even though the patient had some doubt of their absolute correctness.

3. SAME—VALIDITY—QUESTION FOR JURY.—In an action by a passenger for injuries caused by collision of street cars, evidence tending to show that a release signed by plaintiff at the solicitation of de-

fendant's physician while he was treating plaintiff professionally was obtained by misrepresentation, *held* to require submission to the jury of the question of the validity of the release.

APPEAL from District Court, Salt Lake County; S. W. Stewart, Judge.

Action by Louis Viallet against the Consolidated Railway & Power Company. From a judgment for defendant, plaintiff appeals.

REVERSED.

*Wm. A. Lee* and *W. H. Wilkins* for appellant.

*Young & Moyle* for respondent.

### APPELLANT'S POINTS.

The Utah court has declared that it is only "where there is a total defect of evidence as to essential facts, a spark, scintilla, as it is termed, the case should be withdrawn from the jury." In the same case the court further says: "To make out a proper case in all its parts then although it may in the opinion of the trial court be slight, inconclusive, and far from satisfactory, yet it should be submitted to the jury, whose proper province it is to consider and determine its tendency and weight." (*Cunningham v. Union Pacific Ry. Co.,* 4 Utah 206, 7 Pac. 797; *McGarry v. Tanner,* 21 Utah 16, 59 Pac. 93; *Lowe v. City,* 13 U. 94, 44 Pac. 1050; *Jennings v. Pratt,* 19 U. 126, 56 Pac. 951; *Silcock v. R. G. W. Co.,* 22 U. 179, 61 Pac. 565.)

The law is well settled that where a person occupies a fiduciary relation toward another such as parent, guardian, attorney, priest or physician, and obtains from such person any pecuniary advantage by reason of such trust relation, that this alone constitutes the strongest kind of evidence of fraud. (Anson on Contracts [Knowlton's Ed.], p. 218, star p. 167; *Marx v. McGynn,* 38 N. Y. 357; *St. Leger's App.,* 34 Conn. 434; *Drake's App.,* 45 Conn. 9; *Thompson v. Hawkes,* 14 Fed. 902; *Headin v. Minn. Med. Inst.,* 62 Minn. 146, 63 N. W. 168, 35 L. R. A. 417; *Unruh v. Lukens,* 166 Pa. 324, 31 Atl. 110; *App. of Audenried,* 89 Pa. 114, 33 Am. Rep. 731.)

A party need not entertain an unquestionable positive belief in the correctness of an alleged opinion of a physician. It is enough if such person so far relies on such opinion or is influenced by it that it is the inducing cause. (*Peterson v. Chicago Ry. Co.,* 38 Minn. 511, 39 N. W. 485.)

"In the courts of this country with few exceptions an action of deceit may be maintained on account of false representations when the party by whom they were made either knew them to be false or made them in utter disregard of whether they were true or false, or made them believing them to be true but without reasonable ground for such belief, and under such circumstances that he was bound to know the truth." (Anson on Contracts, p. 207, star p. 160, note 1; *Houston T. C. R. Co. v. Brown,* 69 S. W. 651; *Pendarvis v. Gray,* 41 Tex. 329; *Converson v. Blanchard,* 79 Tex. 492, 15 S. W. 700; *Peterson v. Chicago Ry. Co.,* 38 Minn. 511; 39 N. W. 485; *Mo. Pac. Ry. Co. v. Goodholm,* 61 Kan. 758, 60 Pac. 1066; *Coles v. Cassady,* 138 Mass. 437; *Litchfield v. Hutchison,* 117 Mass. 195; *Walsh v. Morse,* 80 Mo. 568; *Caldwell v. Henry,* 76 Mo. 254; *Johnson v. Berney,* 9 Ill. App. 64.)

### RESPONDENT'S POINTS.

The mere fact that the injury was more serious than was supposed at the time the settlement was made, or that the consideration was inadequate, is not proof of fraud. (*Quebe v. Gulf Railway Co.,* 81 S. W. 20; *Southern Development Co. v. Silva,* 125 U. S. 248; *Eccles v. Ry. Co.,* 7 Utah 335; *Houston T. C. R. R. Co. v. McCarty,* 86 Am. St. Rep. 854, 60 S. W. 429.)

If he did not know its contents this would not be any evidence of fraud, because having had an opportunity to read and being able to read he cannot complain that he did not read it. (*Snelgrove v. Earl,* 17 Utah 328; *Gulliher v. Chicago, R. I. & P. R. Co.,* 13 N. W. 432; *Glenn v. Statler,* 42 Iowa 110; *Sanger v. Dunn,* 32 Am. Rep. 789; *Redpath v. Western Union,* 17 Am. Rep. 69.)

Our court has held in discussing generally the question of fraud: "Fraud cannot be presumed from mere suspicious

circumstances, but must be proved." (*Petrovitsky v. Brigham*, 14 Utah 472; *Douglass v. Alder*, 13 Utah 313.)

"The cases cited for the defendants are sufficient, if authority or argument were needed to support the statement that under such circumstances a man has not a right to rely, except at his own peril, upon the representations of the avowed agent of the adverse interest as to what the law will or will not do or will or will not permit to be done. Common prudence and common sense would seem to be in all ordinary cases sufficient safeguard against frauds of that character." (*Thompson v. Phoenix Ins. Co.*, 46 Am. Rep. 358; *Mayhew v. Phoenix Ins. Co.*, 23 Mich. 105; *Aetna Ins. Co. v. Reed*, 33 Ohio St. 283.)

In order that fraud may be found there must be some evidence of fraud and not a mere statement of erroneous opinion. (*Eccles v. Ry. Co.*, 7 Utah 335; *Nelson v. Minnesota St. Ry. Co.*, 63 N. W. 486; *Whitney v. Richards*, 17 Utah 226.)

All parties interested supposed at the time that the injury was only temporary and would be cured within two or three weeks, and that none of them had any knowledge or supposition of any more serious injury; but later it developed that this opinion was in error as to the length of the disability of appellant. Under such circumstances there can be no recovery. (*Quebe v. Gulf Ry. Co.*, 81 S. W. 20; *Houston, etc., Ry. Co. v. McCarty*, 53 L. R. A. 507; *Eccles v. Ry. Co.*, 7 Utah 338; *Sheldon v. Davidson*, 85 Wis. 141; *Robinson v. Parks*, 24 Atl. 411; *Norfolk etc. Hosiery Co. v. Arnold*, 23 Atl. 515; *Evans v. Folsom*, 5 Minn. 355; Anson on Contracts [Knowlton's Ed.], p. 203; *Scrogin v. Wood*, 54 N. W. 437.)

## STATEMENT OF FACTS.

The facts in this case are as follows: On January 13, 1902, plaintiff was a passenger on defendant's electric car, which was going north of State street, in Salt Lake City; that at the intersection of the two lines of the street railway tracks at Fifth, South and State streets, a car, known as the "Waterloo car," was run into the car upon which plaintiff was riding with such force as to throw him violently to the ground, and, as a result, his right shoulder was dislocated.

He was taken by defendant company to a drug store in the
city, when some young physician came to plaintiff, and said:
"I will relieve you if you want me to," and plaintiff consent-.
ed. He was placed under an anaesthetic, and, while under
its influence, and before he recovered consciousness, was tak-
en charge of by the company's (defendant's) physician, who
reduced the dislocation, and otherwise treated the injury.
Plaintiff returned home, about noon, which was within a few
hours after he had been taken in charge by defendant's physi-
cian for treatment. This same physician and the claim agent
of defendant visited plaintiff, and the doctor examined the
injury, tried his shoulder, and tried to get the motion of the
shoulder joint, and, while making the examination, the doctor
stated that the injury was a simple dislocation, and that plain-
tiff would be well within a week or ten days. The claim agent
then ascertained from plaintiff that he was a man with a
large family dependent upon him, and was at that time with-
out means for their support, and offered him $40, and pre-
sented a release for plaintiff to sign. Plaintiff read the paper
and informed the claim agent that he would sign the release
if they would offer him employment with the company in case
he failed to recover within the time stated by the company's
physician, who was treating him for the injury. The doctor
and claim agent then went away, and the claim agent came
back again in the afternoon, and stated that he could not fur-
nish him with employment, but that he would make the offer
of settlement $60. Plaintiff replied that he "would rather wait
a few days and see how the thing was coming out." A little
before noon the next day, the doctor visited the plaintiff again
examined his arm and said: "My friend, you are getting
along all right." He asked the plaintiff if the claim agent
had been there to see him, and plaintiff told the doctor of the
offer of $60 made by the claim agent the day previous, and
the doctor said: "I don't think it is quite enough. I will ad-
vise the company to pay $75, and if they do not want to do
that, I will pay the $15 myself from my own pocket." And
the doctor again assured plaintiff that his injury was very
slight, and that he would be well within a week or 10 days,

and requested plaintiff to inform the claim agent when he called again that the doctor had offered him $75. When the claim agent called, plaintiff again refused to accept $75. The doctor called again the next day, tried the motion of the plaintiff's arm, and told him that he would be all right in a little while; asked plaintiff if he had signed the release, and expressed surprise when told that he had not, and gave reasons why it would be best for plaintiff to sign it. The doctor stated that he had been the company's physician for 14 years and had had lots of cases like that of plaintiff, and cited instances where the company had offered to settle with parties who were injured, and that they had refused, and had gone into court, and did not get anything. "He told me [quoting plaintiff's testimony] that it was better to settle with the company and that generally those who tried to get too much did not get anything. I told him . . . I thought the company ought to offer $250. The doctor said that I could not recover any such thing, because he would be opposed to it; that my injury wasn't such as to get $250 out of company. He said they would not pay $250 for a simple dislocation. I asked him especially that day how long I would be in getting well, and he said he could only repeat what he said yesterday and the day before; that is, you will be well in a week or ten days, but I could put in another week on top of that to rest. He said he would make it $120, if I wanted, and produced a printed slip from his pocket, and asked for a pen and some ink ready to fill it and he filled it out and I signed it, relying on him—as I told him, I trusted him implicitly." The plaintiff's wife was called as a witness, and, after testifying to substantially the same facts as her husband, referring to the statements made by the doctor at the time the release was signed, she stated that the doctor made the following statements: "I am the company's doctor, but I would not take advantage of any working man, especially a man with a family, and he says I tell you, really I guaranty to you, that your arm will be all right in ten days, and will be just as well as it ever was." Continuing she stated that "the doctor was very kind and friendly with us at all times, and every time he spoke to

my husband, he called him 'my friend,' and told him, 'my friend, you are doing well.'" Three or four days afterwards, the doctor again examined plaintiff, and told him that he would soon be all right. The doctor continued to visit plaintiff twice a week for five or six weeks. Instead of improving, the injury gradually grew worse, and plaintiff was finally removed to a hospital for treatment. It further appears that appellant, because of the injury, has substantially lost the use of his right arm; that he is a miner by occupation and earned $2.50 per day prior to his injury; that since the accident, he has never been able to earn more than $1 per day, and then can only obtain work at odd jobs, and that his earning capacity, thereby, has been very much impaired, if not practically destroyed.

On December 2, 1902, plaintiff brought this action to recover damages for the injury received in the collision referred to. It is alleged in the complaint, among other things referring to the statements and representations made to plaintiff by the company's (defendant's) physician soon after the accident respecting the extent of and probable duration of the injury, "that all of said representations were made by the defendant company, as aforesaid, with the intention and for the purpose of influencing and inducing the plaintiff of acting thereon, and to sign said written instrument or release upon the payment of a sum of money to the plaintiff grossly inadequate, and out of all proportion to the real damages suffered by him; that plaintiff believes said representations to be true, and acting solely by reason thereof and in reliance thereupon, he was induced to and did sign a written statement, or release, and accept said $120 from the defendant company, that all of said representations were wholly false and untrue, made by the company recklessly and without regard as to their truth or falsity, and with a full means and knowledge of their falsity; . . . that when plaintiff discovered the falsity of said representations, he made tender in writing to defendant company, and offered therein to repay and refund said $120, and demanded that said release be canceled and surrendered to him." Defendant answered, admitting the

formal allegations of the complaint, and pleaded the release mentioned as a settlement of plaintiff's claim for damages, and a discharge of defendant from all liability arising out of, and because of the collision referred to, and the injuries received by plaintiff therein. At the conclusion of plaintiff's evidence, which disclosed the facts hereinbefore recited, the trial court, on motion of defendant, granted a non-suit and dismissed the case, on the ground that the signing and execution of the release mentioned precluded a recovery by plaintiff. From the judgment entered on the non-suit plaintiff has appealed to this court.

McCARTY, J., after stating the facts, deivered the opinion of the court.

As the record now stands the negligence of respondent must be conceded. Therefore, the only question before us is, was there sufficient evidence tending to show that the release in question was obtained under such circumstances as to make it fraudulent and void, to entitle the appellant to have the case submitted to a jury? We think this question must be answered in the affirmative.

When respondent's physician took charge of appellant at the drug store soon after the accident occurred which caused his injuries, set and bandaged his shoulder, and otherwise treated his injuries in a professional capacity, the confidential relation of physician and patient was created, and continued to exist thereafter, as shown by the record, for several weeks after the release in question was signed and delivered by appellant to respondent. The law is well settled that from the time the relation of physician and patient is created until it ceases to exist, the physician is not only legally bound to act in the utmost good faith in his treatment of his patient professionally, but he is inhibited from taking advantage of the confidence growing out of this relation, reposed in him by his patient, and, by misrepresentations, or other unfair means, or by the exercise of undue influence, induce his patient to convey, transfer, or otherwise dispose of, to such physician, or to other parties whom the physician

may represent in other capacities, valuable property rights
for a wholly inadequate consideration as appears from the
record was done in this case. (9 Cyc. 456-458; *Woodbury v.
Woodbury* [Mass.], 5 N. E. 275, 55 Am. Rep. 479; *Unruh
v. Lukens,* 166 Pa. 324, 31 Atl. 110; Pomeroy's Eq. Jur.,
sections 956, 963.)

It appears from the record that appellant is a man of limi-
ted experience and meager education, and, at the time of
the injury complained of, was wholly without experience re-
specting this class of injuries, or of any other matters per-
taining to medical science; and there is evidence in the record
which tends to show that he not only had faith in the skill
and ability of respondent's physician as a doctor but had the
utmost confidence in his integrity and uprightness as a man.
And the evidence also tends to show that appellant not only
believed the representations made to him by the physician re-
specting the nature and extent of his injuries and their prob-
able duration, but that he acted upon them when he signed
the release in question. The record as it now stands tends to
show that the physician, during the three days that he attend-
ed appellant in a professional capacity, before the release
was obtained, not only professed great solicitude for him
as a patient, but his demeanor and whole course of conduct
was such as would tend to disarm appellant of all suspicion
and distrust, if any he had, of his lack of good faith, and lead
him to believe that he, the doctor, desired—in fact was anx-
ious—to have the railway company, respondent herein, pay
appellant a sum of money commensurate with the damages he
had sustained by reason of his injuries, even going to the
extent, in his apparent solicitude for appellant's welfare, of
offering to pay a part of a stipulated sum "out of his own
pocket" in order that a settlement might be made on what he
claimed to be a just and fair basis. And we think the evi-
dence fairly tends to show that the physician acted in a dual
capacity of both claim agent and doctor, and, while attending
and waiting upon appellant as his patient, recklessly made
statements and gave assurances respecting the nature and
probable duration of appellant's injuries that had a tendency

to deceive and mislead him, for the purpose of inducing plaintiff to sign the release in question, and make the settlement complained of.

It is urged by respondent that appellant's own testimony shows that when he signed the release he had some doubt of the correctness of the statements made and opinions expressed by the doctor respecting the extent of his injuries, and therefore he must be held to have acted upon his own judgment and not that of the doctor. Some detached portions of appellant's testimony on cross-examination, considered by themselves, would seem to support this contention; but, taking his testimony in its entirety, we think that it reasonably shows that he relied almost implicitly upon the representations made and assurances given by the physician as to the extent of his injuries. But even if it be conceded that plaintiff, notwithstanding the repeated assurance of the physician that his injuries were slight, and that the disability caused thereby would be of short duration, still had some doubts as to their absolute correctness, he is not necessarily bound by the release, provided he was induced to sign it because of such representations and assurances. The rule is, that it is not necessary, in order to avoid a contract of this kind, when the transaction is between physician and patient, to show that the patient had unquestionable belief in the infallibility of the judgment of the physician to whom he has given his confidence, and to accept, without question or doubt, the statements and representations made, by which he is induced to part with his property. It is sufficient, if the statements made and assurances given by the physician induce the patient to part with his property, even though he may have some doubt as to their absolute correctness. (*Peterson v. Chicago Ry. Co.,* 38 Minn. 511, 39 N. W. 485.)

Counsel for respondent cite and rely upon the case of *Eccles v. Railway Co.,* 7 Utah 335, 26 Pac. 924, as decisive of this case. In that case the plaintiff was attended and waited on by her own physician, who in no way, in the interest of the railway company or otherwise, used any influence to induce her to sign the release therein mentioned. By an examina-

tion of the opinion in that case, it will be seen that the company's physician called to see plaintiff about twenty hours after she was injured, and found her sitting up, and said to her, "Oh, there is nothing wrong with you at all, etc." The doctor then went away, and she never saw him afterwards. Eleven days after the company's doctor called to see her, she, at the solicitation of the railway company's claim agent, and on the advice of her husband and father-in-law, signed the release therein mentioned. It also appears from the opinion that from the time of her injury, until she signed the release, "she had a physician of her own in constant attendance with whom she could, and doubtless did, consult as to the probable effect of her injuries." It will be observed that in that case the relation of physician and patient was not created, and did not exist between the plaintiff and any physician who represented the railway company. Nor was it shown that her own physician used, in the interest of the railway company, any undue influence to induce her to sign the release therein mentioned. In other words, the plaintiff in that case dealt with the company and its representative at arm's length. Whereas, in the case at bar, the evidence as it now appears tends to show that soon after appellant was hurt, and while in an unconscious condition, and while he was being treated for his injuries by another physician, he was taken in charge by respondent's physician, who set and bandaged his shoulder, and thereafter made regular visits to his home, and waited upon him there, ostensibly, for the purpose of giving him medical treatment, but the main and principal object being to procure as favorable settlement for his company as he could induce appellant to make; and his apparent solicitude for appellant's welfare, as heretofore observed, was only a cloak to remove whatever doubt or suspicion he might have had respecting the good faith of the doctor, and to quiet his (appellant's) fears and apprehensions as to the gravity or seriousness of his injuries. It will thus be seen that there is but little, if any, similarity in the facts of the respective cases. Therefore the decision in the *Eccles Case* is not decisive of the case under consideration.

Respondent cites *Nelson v. Minneapolis St. Ry. Co.* (Minn.), 63 N. W. 46, and *Houston, etc., Ry. Co. v. McCarty* (Tex. Sup.), 60 S. W. 429, 53 L. R. A. 507, 86 Am. St. Rep. 854, as authority in this case. By an examination of these cases, it will be seen that the relation of physician and patient did not exist between plaintiff and defendant's agent in either of them. Nor was there anything said or done by the agent of defendant in either case calculated and intended to deceive and mislead the plaintiff as to the extent of his injuries, for the purpose of inducing him to sign a release for a sum which afterwards proved to be inadequate and out of proportion to the injuries received; the most serious of which were unknown to either party when the settlement was made. In the case of *Nelson v. Minneapolis St. Ry. Co.*, the court, in the course of the opinion, say:

"There is not a particle of evidence tending to show that either of the physicians intentionally misrepresented the extent of plaintiff's injuries or that the statements made by them were not their honest opinions according to their best professional judgment based on existing symptoms."

And the court further observes:

"These physicians were not sent to settle plaintiff's claim, or to advise her. The extent of their authority was to ascertain the nature of her injuries and report the result to the defendant for its information."

In the case of *Houston, etc., v. McCarty,* supra, the plaintiff, while a passenger upon one of defendant's passenger trains was injured in a wreck caused by the actionable negligence of defendant. At the time plaintiff appeared to have sustained no injury except a sprained ankle, and, as stated in the opinion.

"Neither the appellant's [defendant's] agent nor appellee knew or suspected injury to any other part of appellee's person, and appellee exercised reasonable care to ascertain if he was otherwise injured."

The plaintiff accepted $450, as settlement in full for all damages sustained by him in the wreck in which his ankle was injured, and signed a release by which he "released and

forever discharged" the defendant from all liability because of any injuries received by him in the wreck. Afterwards, plaintiff discovered that he had received other injuries, which were unknown to him at the time of the settlement referred to, and that the $450 received by him from the company was inadequate and out of proportion to the injuries of other parts of his body, and he brought suit to set aside the release and recover damages for the additional injuries. Neither fraud nor misrepresentation was alleged or relied upon as a basis for setting aside the release. The court, in a well-considered opinion in which many cases are cited and reviewed, and properly so, that plaintiff, under the circumstances, was was barred by his contract. The court, after observing that "the appellee [plaintiff] . . . had at least the same knowledge and the same means of obtaining knowledge as the appellant, and if there was no fraud in the transaction, the settlement was binding upon him," correctly states the general doctrine as follows:

"That where a party, who has a claim against another for personal injuries, agrees upon a settlement of his claim, and accepts a sum of money or other thing of value in settlement of such claim, he is, in the absence of fraud or concealment, concluded in the settlement, is a proposition sustained, as we think, by one unbroken line of authority," citing numerous cases.

In each of the two cases last referred to, the facts were equally within the knowledge of the plaintiff and defendant, and no relation of confidence and trust existed between the parties. In the case before us the jury might well have found from the evidence, as it now appears in the record, that respondent's physician knew or had reason to believe that plaintiff's injuries at the time he signed the release, were much more serious than he (the doctor) represented them to be, and that he intentionally concealed from plaintiff his real condition, and that plaintiff, on account of the doctor's superior knowledge, accepted and acted upon the representations and assurances made by him respecting the condition and probable duration of his (plaintiff's) injuries.

The case is reversed, with directions to the trial court to set aside the judgment, and to grant a new trial. Costs on this appeal are taxed against respondent.

BARTCH, C. J., and STRAUP, J., concur.