## DOVICH v. CHIEF CONSOLIDATED MINING CO.

### No. 3214.   Decided July 3, 1918.   (174 Pac., 627.)

1. WITNESSES—PRIVILEGED COMMUNICATIONS—PHYSICIANS. While plaintiff, in personal injury action, testified that, when signing an alleged release, he was "bothered with chloroform" administered two days before in an operation, it was improper, under Comp. Laws 1907, Section 3414, as amended by Laws 1911, c. 109, as to privileged communications, to sustain objections to questions asked his physician by defendant as to how long plaintiff was under the anæsthetic, and whether, on the date of signing, he was still under effects of the anæsthetic.   (Page 527.)

2. APPEAL AND ERROR—HARMLESS ERROR. Exclusion of testimony of physician in personal injury case was not prejudicial where, during the further examination of the physician as an expert, the identical information was obtained and appellant received the benefit thereof.   (Page 529.)

3. TRIAL—INSTRUCTION—EVIDENCE—"CLEAR, COGENT, AND CONVINCING." Where a release set up as defense in a personal injury case was sought to be avoided for fraud in procuring it, an instruction that evidence of fraud must be "clear, cogent, and convincing" denoted something more than a mere preponderance of evidence.   (Page 531.)

4. RELEASE—INSTRUCTIONS. In personal injury case, defense being a release, a requested instruction that before the jury could disregard the release on the grounds of false and fraudulent representations it should find that plaintiff himself was not negligent in failing to have the release read to him, held properly refused as inapplicable to the facts.   (Page 533.)

5. RELEASE—INSTRUCTIONS. In personal injury case, defense being a release, a requested instruction that, in addition to finding the release was procured by fraudulent representations, the jury must find defendant was guilty of fraud in preventing plaintiff from having the release read to him before he signed it, held properly refused as inapplicable to the facts.[1]   (Page 533.)

6. MASTER AND SERVANT—DUTY TO INSPECT. Where plaintiff was not engaged in his ordinary occupation as timberman when injured, but had been sent into the main drift, a completed apartment, and the work he was doing there did not tend to make the place dangerous, his duty to inspect did not arise.   (Page 535.)

---

[1] Viallett v. Con. Ry. & P. Co. 30 Utah, 260, 84 Pac. 496, 5 L. R. A. (N. S.) 663.

Appeal from the District Court of Salt Lake County, Third District; *Hon. Geo. F. Goodwin,* Judge.

Action by Mike Dovich against the Chief Consolidated Mining Company.

Judgment for plaintiff. Defendant appeals.

AFFIRMED.

*Dickson, Ellis & Lucas* for appellant.

*Willard Hanson* for respondent.

THURMAN, J.

Action for personal injury. Plaintiff was injured in defendant's mine in Eureka, Juab County, Utah, while engaged in repairing an air pipe line in the main drift on what is known as the 1,400 foot level. Plaintiff was employed as a timberman in said mine, but was also subject to the orders of the shift boss or foreman for any other work that might be necessary in the mine. It is alleged by the defendant that it was also his duty, without special request, to do any other work that might be necessary for the good conduct and safety of the mine when such work appeared to him to be necessary.

On the date of the injury plaintiff was working in what is known as the 1,410-K stope, which was connected with the 1,400 level, or main drift. In going to and from his work he passed through and along the main drift, in which was a car track for moving ore and material, and also an air pipe line strung near the top of the drift supported by pieces of timbers. Where it did not rest upon the timbers it was attached to them by means of a wire. The primary purpose of the timbers was to support the pipe line. They were called sprags and extended across the drift. Whether or not they incidentally supported the roof of the drift is a subject of conflict in the testimony.

On the day in question the plaintiff was ordered by the

shift boss to assist in repairing the pipe line, which was leak-ing or was otherwise out of repair, in the vicinity of the 1,400-K stope. Plaintiff and another employee of defendant, in pursuance of the order, undertook to make the repair. In doing so it became necessary to support the pipe upon their shoulders, and, while in this position, earth, rock, and ma-terial fell from the roof and sides of the drift upon the plaintiff, causing the injury complained of in the complaint.

The testimony of the plaintiff tends to show that the cross-timbers or sprags which supported the pipe were two or three feet below the roof or back of the drift, and did not in any manner support the roof.

The plaintiff in his complaint charges, in effect, that the defendant was negligent in failing to inspect the roof and sides of the drift, in permitting them to become loose and liable to cave, and in failing to timber up the same; that these acts of negligence on the part of the defendant were the cause of the injury.

Defendant admits that plaintiff was in its employ as a tim-berman, and alleges that it was his duty to do other work when ordered or when necessary; admits that plaintiff was ordered to assist in repairing the pipe line, and that while so engaged earth and rock fell from the roof and sides of the drift upon plaintiff and injured him. Defendant, further answering, pleads assumption of risk, contributory negligence, negligence of fellow servants, and a full settlement with plaintiff, and release executed by him releasing defendant from any and all claims and demands, causes of action, and liability for or on account of said injury. The release is al-leged to have been executed by plaintiff on the 3d day of February, 1915, is set out in full in the answer, and states the consideration to be one dollar paid to plaintiff, and the agreement of defendant to pay plaintiff one half the ruling rate of wages for a period not exceeding twenty-six weeks. Plaintiff denied the execution of the release, or, if he did exe-cute it, he alleges the same was procured falsely and fraudu-lently by the defendant, specifically alleging the nature and character of the fraud.

It is alleged and admitted that the main drift was a means

of ingress and egress to and from the various stopes of the mine on that level.

The case was tried to a jury. Judgment for plaintiff. The defendant appeals, and assigns as error various rulings and orders of the court relating to the admission and exclusion of evidence, instructions given to the jury, refusal of defendant's requests, refusal to order a nonsuit, and error in entering the judgment.

The release relied on as a defense by appellant seems to be the main feature of this litigation, sixty-three pages of an eighty-nine page brief are devoted by appellant to the discussion of questions connected with the release in one way or another. The validity of the release being challenged by the reply of plaintiff to defendant's answer, the defendant introduced evidence as to its execution.

Walter Fitch, Jr., assistant superintendent of defendant, testified that he called on plaintiff at the Holy Cross Hospital, Salt Lake City, Utah, February 3, 1915; had a general conversation with him and took up the matter of the release; "read the release over to him, explained it to him in his own language, and asked him if he wanted to sign it. Plaintiff said 'Yes,' the company had always treated him right and he knew they would in the future. He didn't want any trouble with them and would therefore sign the release, and he did so." On cross-examination witness testified he paid plaintiff $1 at the hospital, and that he submitted the release to plaintiff before he signed it. The form was made in Salt Lake City. At that time witness was a representative of the Continental Casualty Company, which was writing insurance for the men in the mine. Witness was getting a percentage of what was written. He collected insurance for the men when they were hurt. He did not remember whether he talked with plaintiff about insurance or not, and did not remember whether plaintiff signed more than one paper or not at the time he signed the release. The principal purpose of witness was to get the release. He admitted that he wanted to get the release executed before some lawyer got hold of plaintiff. This witness was the only one on the part of de-

fendant who testified directly concerning the execution of the release.

On this question plaintiff testified, in substance, that he was in the hospital when Walter Fitch, Jr., called on February 3d. Plaintiff had been operated on on February 1st. He was in bed when Fitch called. Plaintiff did not read or write English. When Fitch called plaintiff was suffering all over, and was bothered with chloroform. Fitch came in the morning and said he came about insurance. Plaintiff had been sick a couple of times before and Fitch had always fixed his insurance. Fitch asked plaintiff his age, height, and weight and asked him to sign his name. He did so, thinking he was signing for insurance. Fitch said nothing about a release. Fitch never showed him the paper claimed to be a release. Plaintiff did not see the release and Fitch did not read it over to him. Plaintiff understood he was signing simply to get his insurance. Fitch did not tell him the mining company would pay him half wages for twenty-six weeks, nor did Fitch give him one dollar. There were present at the time Emil Bovich and Gust Bills. One was on one side of plaintiff's bed and one on the other, five or six feet between his bed and theirs. On cross-examination plaintiff was shown the signature to the release, and admitted that it looked like his, but still persisted in saying he never saw that paper.

Gust Bills testified for plaintiff: Was at Holy Cross Hospital when Fitch came there. Witness' bed was next to plaintiff's, with an aisle between them. They were lying feet to feet. Fitch and plaintiff had a conversation about insurance. Fitch said something about a release, and offered to give plaintiff a dollar, but he wouldn't take it. Fitch had a paper in his hand, but witness did not know whether it was a release or not. Didn't hear Fitch say, "Now, if you sign this you cannot bring suit." If he had said anything like that witness would have heard it. Fitch never said anything about getting half pay from the company. There was nothing said except about insurance. Fitch wanted plaintiff to make a report about the accident. Witness told the man next to him to tell plaintiff not to sign any papers.

Emil Bovich, another witness for plaintiff, testified to the

following effect: Was in the hospital when plaintiff was there. His bed was about three and one-half feet from plaintiff's. A man came up to the hospital like that man (pointing to Fitch). He said he came to fix up insurance. He asked plaintiff's age, weight and height; then asked him if he wanted any money. He asked plaintiff to sign a brown or yellow paper. He did not say anything about a release or giving him half pay for twenty-six weeks. Witness was close by, in the next bed. Gust Bills was on the other side. Witness saw plaintiff sign one paper. Did not see him sign two.

The cross-examination of these witnesses did not materially change the testimony as above stated.

In view of the pleadings and the evidence relating to the release, the court, at the close of the trial, gave special instruction to the jury, which we will hereafter consider in connection with certain requests of the defendant relating to the release.

The plaintiff having testified, as above shown, that he "was suffering all over, and was bothered with chloroform," on the occasion of Fitch's visit to the hospital, the defendant, when introducing its testimony, had Dr. Arthur J. Murphy sworn as a witness. After stating that he took part as a doctor in the operation performed on plaintiff, the witness was asked by defendant's attorney the following question: "Are you able to state now how long he was under the anæsthetic?" Objection by respondent. Then, after stating that he was at the hospital on the morning of February 3d, witness was asked the following question: "When you saw him on that morning, are you able to state whether or not he was under the effects of the anæsthetic administered to him on the 1st day of February, at the time you assisted in performing the operation upon him?" Each of the foregoing questions was objected to as a privileged communication and the objection sustained. Defendant assigns error.

The evident purpose of the questions was to prove by the witness that an anæsthetic, such as was administered to the plaintiff on the 1st day of February, would not in all probability affect his mind or consciousness on the 3d, when the defendant contends the release was executed; that therefore

his claim that on that day he was bothered with chloroform was disingenuous. If the questions asked were material, there is no doubt but that the court erred in sustaining the objection on the grounds of privilege.

Comp. Laws Utah 1907, section 3414, as amended in Sess. Laws 1911, c. 109, at page 181, reads as follows:

"4. A physician or surgeon cannot, without the consent of his patient, be examined in a civil action, *as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient.*" (Italics ours.)

The questions propounded did not seek to elicit, nor could they possibly elicit, any information acquired by Dr. Murphy in attending the plaintiff which was necessary to enable him to prescribe or act for him. This proposition seems to be so self-evident that further comment is, perhaps, unnecessary. This court, in the case of *Madsen* v. *Light & Ry. Co.*, 36 Utah, 536, 105 Pac. 799, speaking through Mr. Justice Frick, after quoting the foregoing statute, said:

"While the courts are not in strict harmony in concretely applying the provisions of statutes similar to the foregoing, yet they practically all agree that, in order to bring the information referred to, in the statute within its provisions, it must be made to appear: (1) That the information was obtained during the existence of the relation of physician and patient; and (2) that the information, however acquired, was necessary to enable the physician or surgeon to prescribe for or act professionally for the patient. The statute should receive a fair and reasonable construction and should be applied and enforced so as to accomplish the purpose for which it manifestly was designed. It seems quite clear that in adopting the statute the Legislature did not intend that all information, whether by communication or otherwise, which is obtained by physicians from their patients, should be privileged, but such information only as may reasonably be necessary to enable the physicians to apply their full professional skill for the benefit of their patients. The statute is not intended as an aid to conceal or smother the truth in a court of justice; but its object is to protect as privileged all that may be said by a patient to his physician while the relation of trust and confidence exists, and, further, to protect all the information a physician obtains through his senses of touch, sight, or otherwise, during such relation, provided the communication or information was reasonably necessary to enable the physician to accomplish the purpose for which the relation of physician and patient is called into existence."

But notwithstanding the court in the present case erred in sustaining the objection and excluding the testimony, it does not follow that the error was in any sense prejudicial. The question as to whether or not respondent's mind or consciousness was affected by the anæsthetic at the time he signed the document was not made an issue in the pleadings, and what he said about being bothered with chloroform seems to have come into the case entirely unsought by his counsel, He was asked concerning his condition as to being in pain. He answered that and volunteered the remainder. Assuming, however, but not deciding, that the questions were material, the question is, was the exclusion of the evidence prejudicial? Counsel for appellant in their able and comprehensive brief practically admit it was not prejudicial, and go very far towards admitting that the questions were not material. They say:

"It is not a case where plaintiff's senses were stupefied by the use of opiates. There is no such claim in the allegations of the reply. There is no such suggestion in the reply. There is here no allegation or proof of any impairment of plaintiff's mental faculties. His own doctors and other witnesses prove the contrary. He was not dazed or rattled. He was a person of mature years in full possession of his mental faculties. He knew what was going on. He did not claim then that he did not fully understand everything that was being done. He does not claim so now."

If there was no allegation of any impairment of plaintiff's mental faculties, and no proof whatever, it is difficult to see the purpose of this assignment. It fails to present even a moot question for the court's consideration. But it would, perhaps, be unfair to use every admission of counsel made in argument as a weapon against them unless it is manifest that the admission was made deliberately and to be used as such. And, besides, there is a more potent reason why the error in this case must be declared to be nonprejudicial. During the further examination of Dr. Murphy, while on the stand after qualifying as an expert in the use of anæsthetics, the following question was asked and answer received without objection:

"Q. Now, I will ask you, doctor, if, in your opinion as a physician and surgeon, a man of thirty-two years of age, who weighed approximately 178 pounds, who had theretofore been in good health, and was strong and able-bodied, on whom, on the morning of February 1, 1915, an operation was performed upon for a fracture of the knee joint, and he was under the anæsthetic given to him in order to perform that operation, I will ask you whether or not on the 3d day of February there would remain any effects from the anæsthetic? A. No effects of the anæsthetic."

Thus it appears the identical information sought by the questions prohibited was obtained and appellant received the benefit thereof.

This assignment is without merit. Comp. Laws Utah 1907, section 3285; *Barker* v. *Savas,* 52 Utah, 262, 172 Pac. 675, and cases cited.

Phillip J. Purcell, a witness for defendant, was asked the following question:

"Did Walter Fitch at that time (when the release was signed) have any authority whatever to adjust or settle any lawsuits for that company?"

The question was objected to by respondent. The objection was sustained and an exception noted. The ruling of the court is assigned as error.

If it were not for the explanation made by counsel in their brief, it would be difficult to see upon what theory it is claimed this question was material. It appears, however, that inasmuch as the plaintiff testified that he understood his business with Fitch at the hospital related to insurance and not to a release, appellant conceived the idea that evidence that Fitch was not authorized to adjust or settle lawsuits for the insurance company would tend to prove that his business with plaintiff did not relate to insurance. In the first place, plaintiff did not testify that his business with Fitch related in any manner to adjustment or settlement of a lawsuit with the insurance company. Hence the information sought by the question asked the witness Purcell was not responsive to, nor in rebuttal of, anything to which the plaintiff testified. In the second place, if it be assumed that plaintiff did state that

his business with Fitch related to adjusting and settling a lawsuit with the insurance company, still testimony to the effect that Fitch had no authority would not tend to prove that he had no such conversation with the plaintiff. The plaintiff charged fraud and misrepresentation on the part of Fitch. How would the fact that Fitch had no authority from the company to make such representations tend to prove that he did not make them? If there is any principle upon which the rules of evidence are based that will justify appellant's contention we are not familiar with it, and we seriously doubt that any such principle exists. This assignment cannot be sustained.

The witness Fitch, when on the witness stand, was asked by appellant the following question:

"Are you able to state, Mr. Fitch, speaking in the tone of voice in which you spoke to Mr. Dovich, that you could have heard the voice of a person speaking in the same tone of voice twenty feet away from you?"

Respondent objected to the question. The objection was sustained, and appellant assigns error.

What the witness Fitch could have heard was wholly immaterial. The question was objectionable from any point of view. The court did not err in sustaining the objection.

At the close of the testimony the court instructed the jury in relation to the document relied on by appellant as a release. The instruction reads:          3

"The defendant contends that if the plaintiff ever had a claim against the defendant, that the same was fully settled between the parties by the agreement and release introduced in evidence and marked 'Exhibit 3.' You are instructed that the giving or receiving of the one dollar mentioned was not essential to make the same a binding agreement, but that the agreement on the part of the defendant company to pay the plaintiff half his wages for a period of 26 weeks was sufficient consideration to make the same binding upon the plaintiff. However, you are instructed that before the same was binding upon the plaintiff he must have understood the nature of the instrument that he was signing, and that it was an agreement on his part to give up and relinquish whatever

claim he had against the defendant company arising out of the accident to him. If he did not so understand the release, but, on account of his unfamiliarity with or lack of understanding of the English language, he believed it to be a paper connected with his claim against the insurance company, then the court instructs you that the same would not be binding upon him, because it is an essential element of an agreement that the party must assent to the terms of the agreement. This does not mean that he must understand the particular words used in the writing, but it does mean that he must understand that he was giving up any claim for damages that he might have against the defendant company. If you find from the evidence that the plaintiff signed the release understanding that he was giving up his cause of action against the defendant, your verdict must be in favor of the defendant, and it is not material that you may believe that the consideration agreed upon was not adequate, considering the extent of the injury as it now appears. The plaintiff claims that the release was procured from him by fraudulent misrepresentations as to the nature of the instrument, alleging that it was represented to him to be connected with the claim against the insurance company. The court instructs you that fraud is not presumed, but the burden is upon the party alleging it to prove the fraud; and in this case the court therefore instructs you that, before you can disregard the release on the ground of fraud, it must appear, by evidence that is clear, cogent, and convincing, that the fraud was practiced upon the plaintiff as alleged, and that by reason of such fraud he was led into signing an instrument which he did not intend to execute.''

This instruction is excepted to for the reason that it does not contain a statement to the effect that a mere preponderance of the evidence would not be sufficient to authorize setting aside the release or hold it not binding upon the plaintiff.

The court did not in so many words inform the jury that a mere preponderance of the evidence would not be sufficient, but it did charge the jury:

''Before you can disregard the release on the ground of fraud, it must appear by evidence that is *clear, cogent, and*

*convincing* that fraud was practiced upon plaintiff as alleged, and that by reason of such fraud he was led into signing an instrument which he did not intend to execute." (Italics ours.)

The words "clear, cogent, and convincing" denote something more than a mere preponderance. If such words were used in an ordinary civil case, and excepted to by the losing party, we believe the exception would be well taken for the reason that they do imply something more than a mere preponderance, and a preponderance is all that is ordinarily required. We are not conceding, however, that more than a preponderance was required in the present case.

For the reasons above stated, this assignment should not prevail.

In this connection it is in order to consider certain exceptions taken by appellant to the refusal of the court to instruct the jury as to two requests, both of which related to the release in question. The first request was to the effect     **4, 5** that, before the jury could disregard the release on the grounds of false and fraudulent representations, it should find that the plaintiff himself was not guilty of negligence in failing to have the release read to him. The second request was to the effect that, in addition to finding the release was procured by false and fraudulent representations, the jury must go further, and find that the defendant was guilty of fraud in preventing plaintiff from having the release read to him before he signed it.

Appellant calls our attention to scores, if not hundreds, of cases which it claims support its contention. We have not been able to read or consider all of them, for they are too numerous for the time we have at our command. We have read sufficient, however, to satisfy our minds that the cases cited are generally distinguishable from the case at bar. Such as appellant has deemed of sufficient importance to quote from are as follows: *Chicago & N. W. Ry.* v. *Wilcox,* 116 Fed. 913, 54 C. C. A. 147; *St. L. & S. F. R. Co.* v. *Chester,* 41 Okl. 369, 138 Pac. 150; *Bessey* v. *M., St. P. & S. S. M. Ry.,* 154 Wis. 334, 141 N. W. 244; *Wallace* v. *C., St. P., M. & O. Ry.,* 67. Iowa, 547, 25 N. W. 772; *Wallace* v. *Skinner,* 15 Wyo. 233, 88

Pac. 221; *Shaffer* v. *Cowden*, 88 Md. 394, 41 Atl. 786; *Lumley* v. *Wabash Ry.* (C. C.) 71 Fed. 21; *Heck* v. *Mo. Pac. Ry.* (C. C.) 147 Fed. 775; *Chicago, St. P., M. & O. Ry.* v. *Bellewith*, 83 Fed. 437, 28 C. C. A. 358; *Albrecht* y. *Milwaukee & S. Ry.*, 87 Wis. 105, 58 N. W. 72, 41 Am. St. Rep. 30; *Hicks* v. *Harbison-Walker Co.*, 212 Pa. 437, 61 Atl. 958; Herman on Estoppel & Res Adjudicata, vol. 2, section 1004; *Barker* v. *Mo. Pac. Rd.* (C. C.) 65 Fed. 460. Very few, if any, of the cases cited go as far as appellant's contention would lead us in cases where the instrument is procured by actual fraud and misrepresentation. If they do we are not disposed to follow them. Appellant also cites *Snelgrove* v. *Morse*, 17 Utah, 321, 53 Pac. 1017, and *Anderson* v. *O. S. L. Ry.*, 47 Utah, 614, 155 Pac. 446. Neither of these cases is authority for the position taken by appellant.

Every case must be decided upon its own facts. In the present case the jury was justified, under the evidence, in finding, and no doubt found, that Walter Fitch, Jr., was the assistant superintendent of the defendant company by which plaintiff was employed; that Fitch looked after insurance for the men employed; that Fitch had adjusted insurance for plaintiff twice before; that when Fitch came, on the occasion of the signing of the paper relied on as a release, plaintiff was in the hospital in bed sick and sore; that Fitch told him he had come to see about his insurance; that nothing was said about a release; that nothing was said about half pay; that Fitch did not pay him $1; that plaintiff thought and understood from Fitch that the business related solely to insurance; that plaintiff could not read or write the English language, and when he signed his name he did it, as he thought, to get his insurance. There is not a single word of testimony as to the conduct of Fitch, or the relation between him and plaintiff, to put plaintiff on his guard or cause him to believe Fitch was trying to deceive or mislead him.

The question, under these conditions, naturally arises, why should plaintiff not trust Fitch implicitly? Why should he be suspicious and required to exercise the extraordinary care and diligence contemplated in defendant's requests?

If the testimony introduced by plaintiff is true, the facts

present a case of palpable, egregious fraud. The very fact that Fitch went there when the plaintiff was sick in bed for the purpose, as admitted by Fitch, "To beat the lawyers to it," tends to show he was seeking an advantage to which he was not entitled. Settlements of damage cases between employers and employees are to be encouraged, but disingenuousness and unfairness on the part of either are reprehensible. In this case we have no hesitancy in declaring that the instruction given by the court stated the law correctly and the requests presented by defendant were properly refused. We refer to some of the authorities which strongly support this view: 14 A. & E. Ency. L. (2d Ed.) 120; *Simeoli* v. *Derby Rubber Co.,* 81 Conn. 423, 71 Atl. 546; *Hogarth* v. *Wm. H. Grundy & Co.,* 256 Pa. 451, 100 Atl. 1001; *Smith* v. *Occident & Oriental S. S. Co.,* 99 Cal. 462, 34 Pac. 84; *Wood* v. *Wickstrom,* 67 Or. 581, 135 Pac. 193; *Burik* v. *Dundee Woolen Co.,* 66 N. J. Law, 420, 49 Atl. 442; *Chicago, R. I. & P. Ry. Co.* v. *Cotton,* 162 Pac. 763; *St. Louis, I. M. & S. Ry. Co.* v. *Morgan,* 115 Ark. 529, 171 S. W. 1187; *St. Louis, I. M. & S. Ry. Co.* v. *Reilley,* 110 Ark. 182, 161 S. W. 1052; *Smith* v. *Rhode Island Co.,* 39 R. I. 146, 98 Atl. 1; *Gordon* v. *Great Atlantic & Pac. Tea Co.,* 243 Pa. 330, 90 Atl. 78; *McCall* v. *Toxaway Tanning Co.,* 152 N. C. 648, 68 S. E. 137; *Clark* v. *No. Pac. Ry. Co.,* 36 N. D. 503, 162 N. W. 406, L. R. A. 1917E, 399; *St. Louis, I. M. & S. Ry. Co.* v. *Smith,* 82 Ark. 105, 100 S. W. 884; *Misenhelter* v. *Geronimo Lead & Zinc Co.,* 195 Mo. App. 526, 192 S. W. 147. See, also, *Viallett* v. *Con. Ry. & P. Co.,* 30 Utah, 260, 84 Pac. 496, 5 L. R. A. (N. S.) 663.

On the question of contributory negligence the court instructed the jury as follows:

"You are instructed that it is the duty of the servant to use reasonable and ordinary care to protect himself from injury, and if he fails to use such ordinary care, and injury results to him by reason of such failure, he cannot recover, even though the master is also guilty of negligence that contributes to the injury. The servant in his work may assume that the master has used reasonable and ordinary care to provide him a reasonably safe place in which to work, and

the servant is not bound to inspect the premises to ascertain whether the master has performed his duty. This does not mean that the servant must not continue at all times to exercise ordinary care for his own safety. But the court instructs you that if the work being done by the plaintiff in this case at the time of the injury tended to make the place insecure, then you are instructed that it was his duty to use ordinary care to discover the danger and to protect himself from injury, and if he fails to do so, he was guilty of contributory negligence and cannot recover.''

Appellant excepted to the instruction, and especially to that part where the court says, ''The servant is not bound to inspect the premises to ascertain whether the master has performed his duty,'' etc. The grounds of appellant's objection, as stated, is that—

''the evidence shows on the part of the defendant that it was the duty of the plaintiff to prepare or make safe any place in either the stopes of said mine or the drifts thereof which at the time appeared to him to be dangerous or likely to cave and injure any one; that under said evidence the question of fact as to whether it was such duty of plaintiff to have inspected said place at the time he was injured was taken from the jury.''

It may have been plaintiff's duty to prepare and make safe any place which appeared to him to be dangerous, but, unless there was a positive duty imposed upon him to inspect in order to ascertain if a place was dangerous, such duty should not be inferred. Appellant does not contend that the evidence showed it to be plaintiff's duty to inspect, but only to make places safe when they appeared to be dangerous. But the court, in the very same connection, says:

''This does not mean that a servant must not continue at all times to exercise ordinary care for his own safety.''

Of course if plaintiff, at the time he was injured, was engaged in making the place unsafe, a higher degree of care would be imposed, and, as to that the court further and properly instructed the jury:

''If the work being done by the plaintiff in this case at the time of the injury tended to make the place insecure, then you

are instructed that it was his duty to exercise ordinary care *to discover the danger* and to protect himself from injury, and if he failed to do so he was guilty of contributory negligence." (Italics ours.)

In this case the plaintiff was not injured while engaged in his usual and ordinary occupation as timberman. He was sent by the shift boss into another and different part of the mine to perform another and different kind of work. He was sent into the main drift, a completed apartment, used by the employees as a means of ingress and egress to and from their work in the mine and for the transportation of material. He had the right, the same as other employees, to assume that the place was safe unless the place appeared to be dangerous. There was evidence that it was dangerous, and was known to some of the employees to have been in a dangerous condition for several days. But the plaintiff had not noticed the dangerous condition and had not been informed of it. He went to his work assuming that the place was safe, especially as it did not appear to him to be dangerous. There was substantial evidence to the effect that the work he was doing did not tend to make the place dangerous; hence his duty to inspect did not arise.

We think, in view of the evidence, the court was justified in giving the instruction, and that appellant's exception thereto is without merit.

In addition to the exceptions already considered, defendant tendered other requests which were refused and exceptions noted. It would not be profitable to review in detail all of these exceptions. We have read them with care and considered them in connection with the instructions given. The objection to all of appellant's requests not covered in substance by the instructions given is that they seek to impose upon plaintiff a burden of responsibility not authorized by law under the admitted or uncontroverted facts. For instance, if appellant's contention were true that it was the duty of plaintiff to make safe any place in the mine that appeared to him to be dangerous, and that obligation also carried with it the duty to inspect every place for the purpose of ascertaining whether such place was dangerous, the result

would be that plaintiff could not recover, for any injury that might happen to him in the mine by falling material, without first showing that he had made careful inspection. In fact it would defeat his recovery even after careful inspection by him, for his careful inspection as an experienced timberman, and failure to discover danger, would of itself imply that the appellant was not guilty of negligence. The contention of appellant, in the last analysis, carried to its legitimate conclusion, would even defeat plaintiff's right to recover if injured by material falling in the drift while passing to and from his work, for his duty to make every place safe and to inspect for the purpose of finding out whether or not is was dangerous would lead to just such result. Neither the pleading nor the evidence justifies any such theory, and therefore appellant was not entitled to have it submitted to the jury.

The instructions of the court to the jury relating to the questions of negligence, contributory negligence, assumption of risk, and upon the matter of the release, were full, fair, and complete, as we view the pleadings and evidence. The rights of both parties were carefully safeguarded by the instructions. There was substantial evidence to sustain the verdict. Whether or not the jury arrived at a just conclusion is not for us to determine. The motions for nonsuit, directed verdict, and peremptory instruction were properly overruled.

We find no error in the record.

The judgment of the trial court is affirmed, at appellant's costs.

FRICK, C. J., and McCARTY, CORFMAN, and GIDEON, JJ., concur.