(Decided ·November 16th, 1898.)

---

JANE Y. SHAFFER *vs.* JOHN A. COWDEN AND OTHERS.

*Vacating Release of Mortgage — Insufficient Evidence of Fraud.*

Plaintiff filed a bill to vacate a release to her nephew of a mortgage on a farm, alleging that she had been induced to execute it by his fraud and upon his assurance that she was becoming surety on a note. The plaintiff's evidence was contradicted on all points by that of the defendant and the latter was supported by certain circumstances in the case. *Held,* that the plaintiff had failed to prove the allegations of the bill by a preponderance of evidence, and that the relief asked for must be refused.

Appeal from the Circuit Court for Washington County (BOYD, J.)

The cause was argued before McSHERRY. C. J., BRYAN, FOWLER, BRISCOE, PAGE, ROBERTS and PEARCE, JJ.

*Norman B. Scott, Jr.* and *W. J. Zacharias* (with whom was *Alexander Armstrong* on the brief), for the appellant.

*William Kealhofer* and *H. F. Wingert,* for the appellee.

McSHERRY, C. J., delivered the opinion of the Court.

We entirely agree with the learned Judge who decided this case below that it is one not free from diffi-

culty.  This difficulty arises, not because there is or can be any doubt as to the legal principles involved, but wholly in consequence of the flat conflict in the testimony of the two contesting parties.  The undisputed facts are few.  The appellant purchased from one Snyder, a farm for the sum of six thousand eight hundred and six dollars, paying the whole of the purchase money. Under an arrangement of some sort between her and the appellee, who is her nephew, the deed conveying the title was made to the appellee who thereupon gave to the appellant a mortgage upon the same property for the whole amount of the purchase money without interest.  This mortgage bears date April the third, 1894. On April the fourteenth of the same year this mortgage was released by the appellant and the release was duly recorded the following day.  The release was a short one written at the foot of the mortgage.  Confessedly the debt secured by the mortgage was never paid by the mortgagor.  On the eleventh day of January, 1897, the appellant filed a bill in Equity alleging that the release had been procured by fraud and praying that it be vacated and annulled.  The defendant answered flatly denying the charges of fraud.  Quite a mass of testimony was taken, and much of it throws but little light on the actual issue between the parties.  That issue is whether the release of the mortgage was procured by fraud.  There are but two witnesses to the transaction and they are the appellant and the appellee. As might be expected their versions of what transpired at the time the release was signed differ as widely as contraries can differ.

The testimony of the appellant is to the effect that when the paper which she subsequently discovered to be a release of the mortgage was signed she was sick and suffering with neuralgia—that the appellee was in Hagerstown that day and came home in the evening. " He said 'Aunt Jane, I want to borrow one hundred and fifty dollars, I cannot get it unless you go on this paper.' And I told him I would sign it in the morning, and he said, that would not do, it would have to be signed that

night. He said Mr. Wingert had got the paper out of the Court and it had to go back in the morning, and he was going to take it to Clearspring that night so that it could go back in the morning." She was next asked: "What did you do then?" and she replied: "I signed the paper that night for one hundred and fifty dollars." She further testified that the appellee did not tell her she was signing a release of the mortgage, and that she did not know she was executing such a paper. The appellee's account of the occurrence is thus given in his testimony: "When I took the mortgage home I laid it on the table. I said, here is that mortgage I got out of the Court. She asked me how it was to be signed, whether with pen and ink or lead pencil. I told her pen and ink. I laid it on the table; she picked up a chair and sat down; took off her spectacles, wiped them off with her apron. I asked her where the ink was. She told me in the front room of the house, the parlor. I went through two rooms and a hall, brought the pen and ink to her, sat it down on the table; she was reading the mortgage or release at the time I put the pen and ink there. She said, 'where must I sign my name?' I showed her; she signed her name and after getting through signing her name, as I had no blotter, I left it open to dry. She looked at it again and read it over, and she turned around to me and said, 'now, John, you have more than Will.' She said, 'you must relinquish your half in your mother's farm, so that both of you boys might have a farm.' I said I would; I was very willing to do that. She said: 'Now, John, I am going to Chambersburg and your mother is going along with me; we are going to make our wills.' She told me she had made her will when she returned from Chambersburg."

Here then, we have the appellant testifying that she did not know she was signing a release—that she thought and believed she was signing a note for one hundred and fifty dollars—and the appellee swearing with equal emphasis that Mrs. Shaffer did know what she was signing and that she read the release both before

and after signing it. Her signature to the release is admitted by her to be in her own handwriting. The burden of proof to establish the alleged fraud in the procurement of the release is, if no confidential relation existed between the parties, obviously on the one who assails its validity; and it is, therefore, necessary for Mrs. Shaffer to show by a preponderence of evidence that the charge which is the gravamen of her bill is sustained. There is not a particle of testimony tending to show that there existed any confidential relation between Mrs. Shaffer and her nephew, as the term confidential relation is understood in the well-known doctrine of a Court of Equity; and without further comment we may treat that contention as wholly eliminated from the controversy.

If the case stood alone on the testimony of the appellant and the appellee—the one alleging the fraud and the other denying it—and if neither one of them were corroborated or contradicted by other circumstances, the assertion of the one would be neutralized by the denial of the other, and, as a consequence, the plaintiff's allegations would not be proved. *Keller v. Kunkel*, 46 Md. 570. We must turn, then, to the other evidence in the record to ascertain whether the testimony of either of the parties is strengthened; and this requires us to go somewhat more fully into the facts.

It appears that Mrs. Cowden who is a sister of the appellant, is, as is the appellant, a widow. She has two sons and owns a farm upon which she and they reside. The appellant is childless. Mrs. Shaffer shortly after becoming a widow removed from Pennsylvania and took up her abode with her sister. She very soon determined to purchase a farm, and it seems quite clear from the record that she intended this to be a home for herself and that she designed her two nephews to own it after her death. She finally purchased a farm from Henry Snyder, adjoining the land owned by her sister. The deed as first prepared conveyed the farm to Mrs. Shaffer; but it was not executed and on the same day another was drafted and duly signed and acknowledged;

and in this, the appellee was named as the grantee. It bears date on March the twenty-eighth, 1894. As Mrs. Shaffer was not prepared to pay the purchase money on that day, the deed was not delivered. But it is a significant fact that though she knew the deed conveyed the farm to her nephew—that he had been substituted as the grantee in place of herself—and though she further knew that she intended to pay the entire purchase money, not a suggestion was made by her that a mortgage or other lien of any kind should be given by the appellee to secure the payment by him to her of the money she was about to invest in the property. This strongly confirms the statement made by the appellee that his aunt whilst first intending that the farm should ultimately go to him and his brother, had subsequently changed her mind and declared that the appellee should have it provided he would release to his brother his prospective interest in his mother's farm. It was not until April the third that anything was heard about a mortgage. On that day a Mr. McNulty, who had transacted some business for Mrs. Shaffer, reached Hagerstown with part of the purchase money for the farm, and upon then learning that the deed as executed conveyed the title to the appellee, he insisted that the mortgage should be given. John Cowden flatly refused to take the farm with a mortgage for its full value upon it. He, his aunt and his mother retired from Mr. Wingert's office to confer, and he states that his aunt then agreed to release the mortgage as soon as McNulty went away and that he accordingly consented to execute it. Mrs. Shaffer when examined in chief denied this agreement, but in her cross-examination she merely said she did not remember it.

Whilst we lay out of view and attach but little importance to the declarations made by Mrs. Shaffer to numerous witnesses to the effect that the farm belonged to John; because, the title standing in his name, those declarations, or many of them, are equally as consistent with the existence of the mortgage as with its release; yet there *is* a circumstance of considerable moment to

which allusion will now be made, and which is not
fairly capable of explanation upon the theory that she
regarded the mortgage as still subsisting.   It is perfectly
clear from the testimony of Mr. Wingert, that in the
autumn of 1894, he informed Mrs. Shaffer that the mort-
gage had been released and explained to her the effect
of the release, though she did not seem, he says, to un-
derstand the situation fully.   Still it cannot be doubted
that she *then* knew the mortgage had been released.   A
year later—that is in October, 1895—she wrote a letter
to the appellee and his wife.   A postscript appended
to the letter is in these words:   "Take good care of the
baby.   When you write don't you mention anything
about your farm, I don't want the girls to know I helped
you."   The girls referred to were other relatives of hers.
Here, then, with knowledge that the mortgage had been
released a year and a half previously she speaks of the
farm as the appellee's farm; and she also speaks of hav-
ing helped him, which could hardly have meant that
she held an overdue mortgage upon that farm to the
extent of its full value; but clearly implied that she had
given the property to him.

It is apparent that Mrs. Shaffer's memory is faulty.
She testified, as already pointed out, that the paper she
signed on April the fourteenth, she thought and believed
was a note for one hundred and fifty dollars; and when
asked if she had signed for the appellee any other paper
on that day she replied that she had not.   Now, the
record discloses that she in fact did sign, as surety for
him on that very day a note, and the note was produced
and her signature was identified by her.   The note was
for one hundred dollars.   She has manifestly confused
that transaction with the signing of the release, and
this is made more apparent by her statement that at the
time she signed what she says she supposed to be the.
one hundred and fifty dollar note, but which was in fact
the release, the appellee told her Mr. Wingert had pro-
cured the paper she was asked to sign, from the Court
house and that it had to go back in the morning.   And
this is what the appellee declares he stated to her when

he handed the release to her to be signed. In point of fact the mortgage, still unrecorded, had been obtained by Mr. Wingert from a deputy clerk under a promise that it would be returned to the Clerk's office the following morning.

Mrs. Shaffer had a perfect right to give to her nephew this farm and she had the right to release the mortgage which had evidently been executed at the instance of Mr. McNulty, and not because she originally contemplated requiring it. If she did this freely and voluntarily no one but her creditors, if she had any, could question or impeach it. She has made no objection because the deed stands in the name of the appellee. Her sole ground of complaint is that the mortgage which she herself never exacted but which was executed solely because her agent McNulty insisted on having it, has been released.

But if Mrs. Shaffer did not read the release before executing it, it was certainly in her power to have done so. Her failure to read it proves, not fraud on the part of the appellee, but carelessness on her own part. It would lead to endless confusion and uncertainty in all business transactions, if a person who executes without coercion or undue influence or persuasion, a solemn release under seal, can subsequently impeach it on the ground of her own carelessness, though at the very time of its execution she might, had she seen fit, have advised herself fully as to the nature and effect of the act she was doing. She cannot invoke her own heedlessness to impeach her solemn release, and then call that heedlessness some one else's fraud. If she did not know what she was signing it was her plain duty to use her eyes and ascertain. *Spitze* v. *B. & O. R. R. Co.*, 75 Md. 171.

. Failing to discover in the record any confirmation of Mrs. Shaffer's testimony, but perceiving that it is flatly contradicted by the appellee, and that the attendant circumstances to which we have alluded give the color of probability to the claim of the appellee, we are constrained to withhold the relief she seeks and to affirm

the decree appealed from. That she is, however, entitled to a home during her life, upon this farm is not open to dispute. It is one of the things about which there is no contention.

> *Decree affirmed with costs above and below.*

(Decided November 16th, 1898.)