JOSEPH G. YOUNG *v.* ROBERT J. MURRAY ET AL.
[No. 3, October Term, 1930.]

*Decided November 13th, 1930.*

The cause was argued before Bond, C. J., Urner, Offutt, Digges, Parke, and Sloan, JJ.

*Irving H. Mezger,* with whom was *Harry D. Kaufman* on the brief, for the appellant.

*Paul R. Hassencamp* and *Allan W. Rhynhart,* for the appellees.

Parke, J., delivered the opinion of the Court.

Dr. Robert J. Murray, the defendant, is the owner of a small farm of about thirty-five acres in Baltimore County. Because of her ill health, his wife, Clara J. Murray, went, some time before 1916, to live on the farm, where she stayed until her death on November 29th, 1925. The defendant was a physician and continued to live and practice his profession in Baltimore, but often visited his wife on the farm. In 1917, Joseph G. Young, who had known the doctor and his wife for several years, was engaged to take care of the property and later his wife nursed and looked after the doctor's wife. Young and his wife performed these services during the life of Mrs. Murray, and had charge of the premises for some time after Mrs. Murray's death. The arrangement was that the plaintiff should occupy the farmhouse and, in addition to the services rendered Mrs. Murray, should cultivate the property. The doctor was to receive the apples grown in the orchard, but the plaintiff was to have what he could produce by cultivation of the soil. The plaintiff's duties on the farm were light, and he operated the doctor's wood-sawing machine for their common benefit, and had time to work away from the farm as a mechanic.

Under these circumstances, the wife of the defendant had her will written by William J. Peach, whose brother had married the sister of the plaintiff. The will was executed and was witnessed by the writer and his sister-in-law, and

was dated March 5th, 1925. By this will the testatrix bequeathed to the plaintiff an improved leasehold lot in Baltimore City and, except the cash which would be left at the time of her death, gave all her personal property of every description to the plaintiff's wife. The will recited that these two bequests were for services rendered to the testatrix by the legatees. The testatrix then bequeathed the residue of her estate to her husband, whom she named as her executor. The will was taken by Mr. Peach, who was the register of wills, and filed in his office, where it was kept until he delivered the will to the executor on December 2nd, 1925. The will was probated on December 10th, 1925, and, as the estate consisted of the leasehold lot and $714.60 in bank, there was but little to pass under the residuary clause to the husband, who renounced the will on the day of its probate and elected to take his "dower" or legal share.

The total estate for distribution was $2,392.80. The husband was distributed one-half, which was in the form of $392.80 in money and an interest in the leasehold lot to the extent of $803.60, and this left for distribution under the will to the plaintiff the remaining interest in the leasehold lot of $1,196.40 as expressed in terms of its value or appraisement of $2,000.

The Orphans' Court of Baltimore County passed, on June 16th, 1926, an order directing and authorizing the executor to convey by grant the leasehold lot to the plaintiff and defendant in accordance with the distribution made in the account. Code, art. 93, sec. 144. On the same day three deeds were executed and delivered. The first deed was by Robert J. Murray as executor of the testatrix. It was executed pursuant to the order of the Orphans' Court and granted to the plaintiff, Joseph G. Young, and the defendant, Robert J. Murray, undivided interests in the leasehold lot in the proportion of 80,361 and 119,640. In order to vest the entire leasehold estate in the defendant, he and Joseph Young executed and delivered a deed assigning the leasehold property to Paul R. Hassencamp, who thereupon assigned by a third deed the leasehold interest in the lot to Robert J. Murray

in severalty. Hassencamp was merely a conduit of title and Young received nothing for his interest. The signatures and acknowledgments of the grantors were witnessed and taken by the same notary public, and the three deeds were successively recorded, after the interval of a minute, on the date of their execution.

After these deeds were delivered, the plaintiff continued to live on the farm in apparent acceptance of the status created by the several grants until November, 1927, when he was notified by the defendant to leave on the first day of the following March. The plaintiff then demanded in person, and, later, on December 19th, 1927, by his counsel, formally demanded in writing, that the defendant pay to the plaintiff $2,350 as the appraised value of the leasehold lot, which was the alleged consideration for the grant of the plaintiff to the defendant. The defendant denied liability when both demands were made; and, on January 24th, 1929, the bill of complaint was filed.

The bill of complaint made both Dr. Robert J. Murray and Paul R. Hassencamp, his attorney, the defendants, but as Hassencamp was a nominal party, the word "defendant" is used in this opinion to designate the defendant Robert J. Murray. The bill proceeds upon two conflicting theories. The first is that the grant to Hassencamp and the one from him to the defendant should be annulled for fraud; and the other is that the defendant be adjudged indebted to the plaintiff in the sum of $2,350, as the unpaid consideration for the grant of the chattel real, and that, in default of the payment, a vendor's lien be enforced by the sale of the leasehold lot through a trustee to be appointed by the court. The two theories were irreconcilable and were indicative of the dubious character of the evidence given before the chancellor in support of the bill of complaint.

The testimony on the part of the plaintiff was that he was ignorant of the bequest to him until some time in the first part of June, 1926, when the defendant told him that he had an interest in some property which was appraised at $2,350; and that, if the plaintiff would sign certain papers,

the defendant would treat the plaintiff right. At one point in the testimony the plaintiff stated that the defendant did not identify the property, and at another he asserted that the leasehold lot here in controversy was the one which had been appraised. As a result of this conversation the plaintiff met the defendant at the latter's house in Baltimore, and went with him to the office of the defendant's lawyer, and there executed the deed in question in the presence of the defendant, his attorney, and the notary public. The plaintiff further testified that he never inquired what his interest was, nor asked a single question, but signed and acknowledged and delivered the papers without reading the documents or having any personal or imparted knowledge of their contents or of what he was doing. The plaintiff was a mature man, in the possession of all his faculties, able to read and write, and of sufficient intelligence either to know or by inquiry or reading to obtain the knowledge of the nature of the transaction. He was apprised of the gravity of the transaction by the form of the documents, the necessity of their being signed, with the attestation of a witness, and acknowledged and delivered. Nevertheless and notwithstanding the solemnity of his own execution of the deed, he neither sought nor was he denied, during the fifteen minutes which he admits to have spent in the lawyer's office, the opportunity to acquire full knowledge of the contents and effect of the grant and release which he executed and delivered. It is incredible that the plaintiff did not know that by the papers be executed he would release the executor, and assign to the defendant the plaintiff's interest as legatee. His presence and his acts do not square with any other inference. The plaintiff confirms this conclusion when he testified that the defendant "told me it was papers concerning this property, and that he wanted to hold this property in his hands and if I signed them papers he would treat me right."

So, in its final analysis, the plaintiff's complaint rests upon his testimony that he was induced by the defendant to assign his interest upon the defendant's antecedent assurance that he would treat the plaintiff right. The plaintiff stated that

he did not ask nor did the defendant explain what was meant by the phrase "treating him right." Whether such a statement was either a promise not too indefinite for enforcement or a fraudulent representation because, under the circumstances, deceitfully made without any intention of fulfillment, is not here a problem for solution, since, according to the clear weight of the evidence, the defendant did not make such a promise or representation. See *Williston on Contracts,* sec. 41, p. 68, secs. 1496, 1521. The defendant denied that he said or ever promised to pay anything; and the deed in which the plaintiff conveyed his undivided interest to a third party in order to put the title in the defendant in severalty declared the grant was "in consideration of the sum of five dollars and other good and valuable consideration, the receipt of which is hereby acknowledged."

The defendant's narration of the circumstances which led to the execution of the grant here involved is consistent with its tenor and effect. The defendant testified that soon after his wife's death he went to the farm and, while hunting with the plaintiff, he informed the plaintiff of her bequest, and the plaintiff said that he did not want the property and would not have it, and told the defendant to let him know when to go into Baltimore to sign the necessary papers to put the whole title in the defendant. While undoubtedly this position was so unselfish and generous as to be unusual, yet his action was explicable if he had been compensated for his services according to his contract with the defendant, and, therefore, believed he should not accept a gift which, if given effect, would practically deprive the husband of any appreciable portion of his wife's estate. Whatever may have been his motive, Dr. Charles M. Brauning, who was a friend of both and a disinterested witness, testified that in the year of Mrs. Murray's death the plaintiff informed him that the defendant had told the plaintiff of the bequest but "that he did not want the property. That he did not think it belonged to him and that he had told the doctor that he could have it." These declarations were denied by the plaintiff, but the documents he executed speak the language of these declarations.

562

Furthermore, the testimony of the defendant, who in this is corroborated by the attorney and notary in whose presence the papers were executed, is that the plaintiff had all the documents presented to him and their purpose and effect fully disclosed and explained before their execution and delivery. *Williston on Contracts,* sec. 1577.

The court finds nothing in the relation of the grantor and grantee to relieve the plaintiff of the burden of establishing his rights to relief; and, after carefully weighing all the testimony in the light of the circumstances, the court agrees with the decision of the chancellor that the evidence in this record is insufficient for a court of equity to find either fraud or a breach of contract or duty. If a man, without fraud or duress, make a gift, while in the full possession of the capacity validly to contract or grant, he cannot find relief in equity when he would afterwards recall his bounty because of its original improvidence. *Diffenderffer v. Knoche,* 118 Md. 189, 194, 195; *Shaffer v. Cowden,* 88 Md. 394, 396, 397, 400; *Poole v. Poole,* 129 Md. 387, 389, 390; *Shriver v. Druid Realty Co.,* 149 Md. 385, 390; *Goodwin v. White,* 59 Md. 503, 505, 507, 509; *Reil v. Wempe,* 145 Md. 448, 463; *Simpson v. League,* 110 Md. 286, 293.

*Decree affirmed, with costs to the appellee.*