### W. M. HARRISON v. SOUTHERN RAILWAY COMPANY.

(Filed 19 May, 1948.)

**1. Fraud § 2: Cancellation of Instruments § 2: Torts § 8a—**

Evidence of conversations by the parties subsequent to the execution of the release signed by plaintiff is impertinent to the issue of fraud in the procurment of the execution of the release, and is properly stricken upon motion.

**2. Torts § 8a: Cancellation of Instruments § 2: Fraud § 5—**

A person is under duty to read an instrument executed by him, and where he has the ability and opportunity to read the instrument he may not attack it for alleged misrepresentation as to its contents in the absence of fraud or oppression.

**3. Same—Knowledge on the part of the representee forestalls deception.**

Plaintiff was injured in the course of his employment by defendant. Plaintiff's evidence disclosed that defendant's agent stated that defendant would pay only hospital and medical expenses, that after debate over the matter for two or three weeks, plaintiff signed an instrument without reading it in reliance on the agent's representation that it was solely for the purpose of admitting him to the hospital. The instrument was a release from liability in consideration of defendant's agreement to pay all hospital and medical bills in connection with treating the injury. Defendant paid all hospital and medical expenses in accordance with the agreement. *Held:* The evidence discloses that plaintiff had knowledge of the nature of the instrument, and is insufficient to show fraud in the procurement of the release.

**4. Cancellation of Instruments § 9: Torts § 8a—**

Where plaintiff's reply alleges that defendant's agent represented that plaintiff would not be admitted to the hospital at defendant's expense unless "plaintiff executed a form which was the release mentioned in said answer," the allegation is tantamount to an averment that plaintiff knew the instrument was a release, and negates any fraud in the *factum*.

**5. Torts § 8a—**

Ordinarily a release may not be avoided on the ground that the injury did not yield to treatment as readily as was thought or anticipated at the time the release was executed.

BARNHILL, J., dissenting.

DEVIN and SEAWELL, JJ., concur in dissent.

APPEAL by plaintiff from *Nettles, J.,* at September Term, 1947, of ROWAN.

Civil action to recover damages for an alleged negligent injury.

On the night of 2 March, 1943, the plaintiff sustained a hernia while working for the defendant in its roundhouse at Spencer, N. C. He was

assisting the engine carpenter in installing a 400-pound coupler in the front of an engine. It is in evidence that ordinarily three men, and sometimes four, were used in the installation of such a coupler, and that on this particular occasion, the engine was not flush with the roundhouse floor, as was customary, making it necessary to place a board over the repair pit in front of the engine to give the plaintiff a footing while assisting in the work. Plaintiff states that his foot or the board slipped and he felt a sharp pain "shoot up" through his side. On examination, the defendant's surgeon, Dr. McKenzie, pronounced it hernia.

It is alleged that defendant's negligence consists in failing to exercise due care to furnish the plaintiff a safe place to work and sufficient help to do the work. *Pigford v. R. R.,* 160 N. C., 93, 75 S. E., 860.

In a few days the plaintiff gave the defendant's claim agent a written statement concerning his injury. About ten days thereafter the claim agent again saw the plaintiff, who was still at work, and told him the Company agreed with Dr. McKenzie that he needed an operation and that they would bear the expense as was their custom in such cases, but that they would not pay for any loss of time. Plaintiff protested that he could not afford to lose the time necessary for an operation.

Later in the month, on 29 March, 1943, the defendant's claim agent had another conversation with the plaintiff, at which time he signed a paper-writing agreeing to release the defendant from all liability, in consideration of which, it was stipulated: "The Southern Railway Company will pay all doctor and hospital bills in connection with a hernia operation growing out of the above mentioned personal injuries." . . . (Signed) "W. M. Harrison (Seal)."

Before signing the release, however, plaintiff says he was led by defendant's agent to believe that he was only signing a paper which would admit him to the hospital, and that he was deceived and misled in the matter. "I signed the paper believing it was a form to get me in the hospital; I can read but I didn't read it. I didn't have the opportunity. Mr. Barnett told me what he was fixing."

On several occasions thereafter, plaintiff says the defendant's agent renewed his luring statements and misleading promises, and agreed with him that he was entitled to compensation. The plaintiff has had four operations for hernia but is still suffering from his injury.

The pleadings join issue on negligence, the foregoing release, and the statute of limitations.

At the close of plaintiff's evidence, there was a judgment of nonsuit, from which this appeal is prosecuted.

*Nelson Woodson for plaintiff, appellant.*
*W. T. Joyner and Linn & Shuford for defendant, appellee.*

STACY, C. J. The question for decision is the correctness of the nonsuit.

The record discloses that the plaintiff is a man of business experience, 32 years of age and literate. He says that prior to entering the employ of the defendant, he was "in the fish and oyster business for 10 or 12 years in a big way. . . . I have had experience in making out sales tickets and collecting money in business." He is now in the wholesale oyster business at Salisbury.

Plaintiff began work with the defendant as an engine-carpenter helper in its repair shops at Spencer around the first of the year 1942. On 2 March, 1943, he suffered an injury. Thereafter, on 29 March, 1943, he signed a release and remained in the employ of the defendant until 3 March, 1946. This suit was instituted 28 February, 1946, three years, lacking one day, from date of accident.

The plaintiff, on his examination in chief, states that before signing the release, the defendant's agent, after receiving instructions from Washington, told him "that where a man gets ruptured on the job," the Railroad "would just pay the doctor and hospital bills—that they would not pay any loss of time." Plaintiff protested that he could not afford to lose the time which an operation would entail, and after several interviews the agent finally said : "Well, like I told you before, this is just all that they will do and it is a practice they have been going through for 20 years and they are not going to change it in your case. Now, if you want to go in here and complete filling out the form, we will fix it."

With this knowledge and information, the plaintiff signed the release without reading it, and accepted its benefits for nearly three years thereafter. It is stipulated that the defendant "has paid a total of $680.70 for surgeon and hospital fees in connection with four operations on the plaintiff for hernia."

Before going to Richmond for the fourth operation on 24 August, 1945, the plaintiff consulted an attorney. He says : "I had legal advice . . . before I went through the fourth operation." *Pass v. Rubber Co.,* 198 N. C., 123, 150 S. E., 709.

The conversations between plaintiff and defendant's agent, subsequent to the signing of the release, were stricken as impertinent on the issue of fraud in the procurement of the release. Certainly the plaintiff understood when he signed the release that all he would get was his surgical and hospital bills in keeping with the general practice of the defendant, since the question of further compensation was at issue and debated at the time. *Supply Co. v. Watt,* 181 N. C., 432, 107 S. E., 451. This central fact, which the release confirms, was not changed or modified retroactively by subsequent conversations with the claim agent, whose limited authority in the premises was known to the plaintiff. Fraud is a matter of prior intent and present purpose, rather than subsequent

reflection or afterthought. *Laundry Machinery Co. v. Skinner,* 225 N. C., 285, 34 S. E. (2d), 190; *Kemp v. Funderburk,* 224 N. C., 353, 30 S. E. (2d), 155; *Ward v. Heath,* 222 N. C., 470, 24 S. E. (2d), 5; *Stone v. Milling Co.,* 192 N. C., 585, 135 S. E., 449; 23 Am. Jur., 771. It is the luring bait or that which induces or enters into the transaction as a corroding influence. *Furst v. Merritt,* 190 N. C., 397, 130 S. E., 40; *Ebbs v. Trust Co.,* 199 N. C., 242, 153 S. E., 858; 37 C. J. S., 204. "Fraud is the egg that spoils the omelet"—MacRae.

Speaking to a like situation and a similar release in *Presnell v. Liner,* 218 N. C., 152, 10 S. E. (2d), 639, it was said : "If the plaintiff did not read the release before he signed it, this fact cannot avail him unless prevented from so doing by the defendants. He could read; it was his duty to read the instrument before executing it, *Aderholt v. R. R.,* 152 N. C., 411, 67 S. E., 978, unless prevented." It is not contended that plaintiff was prevented from reading the release before he signed it. "He is charged, therefore, with knowledge of its contents." *Aderholt v. R. R., supra.* The duty to read an instrument or to have it read before signing it, is a positive one, and the failure to do so, in the absence of any mistake, fraud or oppression, is a circumstance against which no relief may be had, either at law or in equity. *Colt v. Kimball,* 190 N. C., 169, 129 S. E., 406; *Potato Co. v. Jenette,* 172 N. C., 1, 89 S. E., 791.

It is established by the decisions on the subject that one who signs a written instrument, without being induced thereto through fraud or deception, cannot avoid its effect on the ground that at the time he signed the paper he did not read it or know its contents, but relied upon what another said about it. *School Com. v. Kesler,* 67 N. C., 448; 45 Am. Jur., 683; Anno. 55 Am. St. Rep., 509. It is the duty of one signing a written instrument to inform himself of its contents before executing it, if he have the ability and opportunity to do so, and in the absence of fraud or overreaching he will not be allowed to impeach the effect of the instrument by showing that he was ignorant of its contents or failed to read it. 96 A. L. R., 995. He cannot invoke his own heedlessness to discredit his solemn release, and then call that heedlessness someone else's fraud. *Shaffer v. Cowden,* 88 Md., 394, 41 Atl., 786.

It is true, the plaintiff says he "didn't have the opportunity" to read the instrument. He had the opportunity to sign it, to see that it was a sealed instrument, and a like opportunity to read it, or have it read, so far as the record discloses. But what is equally important, the plaintiff got what he understood he was to get, and no more, at the time. In this, he was not deceived or misled. *Harding v. Ins. Co.,* 218 N. C., 129, 10 S. E. (2d), 599. Knowledge on the part of the representee forestalls deception. *Cox v. Johnson,* 227 N. C., 69, 40 S. E. (2d), 418; 23 Am. Jur., 943; 12 Am. Jur., 630. One cannot be deceived by that which he knows. *Cox v. Johnson, supra.*

Moreover, there is no evidence that the description of the instrument by the defendant's agent as "a paper which would admit him to the hospital" was either false or misleading within the meaning and understanding of the parties. They had been debating for two or three weeks whether plaintiff would sign the paper in order to obtain a herniotomy and hospitalization at the defendant's expense. He knew that this was all he was to get and that such was the purpose in executing the paper. It did admit the plaintiff to the hospital, not once but four times, at the expense of the defendant.

The plaintiff does not allege that he signed the release under any misapprehension as to its contents. The representation as alleged in the reply is, that plaintiff "would only be admitted to the hospital at defendant's expense unless plaintiff executed a form which was the release mentioned in said answer." So it is alleged that plaintiff signed the very paper which he intended to sign, and he knew it was "the release mentioned in said (defendant's) answer." This dispenses with any fraud in the *factum*. *Furst v. Merritt, supra.* There is no allegation of any fraud in the treaty. Indeed, it may be doubted whether the allegation of fraud is sufficient to raise an issue in respect thereof.

The evidence is insufficient to avoid the release on the ground that plaintiff's hernia did not yield to treatment as readily as was thought or anticipated at the time. Annotations 48 A. L. R., 1464, and 117 A. L. R., 1022, *et seq.*

There is no debate over the law of the case, but only as to the proper interpretation of the record.

The record supports the judgment of nonsuit.

Affirmed.

BARNHILL, J., dissenting: As the majority opinion is made to turn on the validity of the release signed by plaintiff, it is not necessary to discuss the evidence of negligence further than to say that, in my opinion, there is evidence of the failure of the defendant to furnish sufficient help and a safe place to work.

The defendant's agent stated to plaintiff shortly after his injury "he had a form to complete and fill out before I could be admitted to the hospital as a Railroad patient." Shortly thereafter he told plaintiff he wanted to complete his records and "that in case of strangulation of a hernia that it would put me in right much of a fix if I didn't have this form completed which would admit me in the hospital as a railroad patient. . . . He said in case it would get strangulated around 2 or 3 o'clock at night it would be inconvenient to get in touch with him or someone else that could fix the papers that could admit me in the hospital," and asked plaintiff to come by his office the next day "to complete the form." The next day the statement was repeated and plaintiff signed

the instrument. At the time Barnett, the agent, in soliciting a witness, stated to others in the presence of plaintiff "that he wanted to fix me up to go to the hospital." He also told G. C. Kepley, who signed as a witness to plaintiff's signature, that "he had some papers he wanted Mr. Harrison to sign to get him in the hospital" and a Mr. Holshouser said in Barnett's presence when Kepley demurred, "it wasn't nothing."

The ungrammatical statement proved to be prophetic. It was indeed something. Plaintiff, thinking he was signing hospital admission papers released all claims he had against the defendant arising out of his injuries, save and except the hospitalization costs. *McCall v. Tanning Co.,* 152 N. C., 648, 68 S. E., 136; *Butler v. Fertilizer Works,* 193 N. C., 632, 137 S. E., 813; 23 A. J., 874. Thus he signed one instrument thinking he was signing another. He was induced so to do by the false representation it was a paper to admit him to the hospital. This, in my opinion, constitutes fraud in the *factum,* or at least evidence thereof sufficient to be submitted to the jury.

Plaintiff did not read the instrument before signing. Even so, if there was fraud in the *factum,* then plaintiff's failure to read is no defense. He signed the paper "believing it was a form to get me in the hospital." Thus he never signed the paper he intended to sign and never intended to sign the instrument to which his signature is attached. He was induced to sign by false representations as to the nature and content of the instrument. See 23 A. J., 874, and authorities cited in notes.

The representations of Barnett as to the character of the paper plaintiff was requested to sign were sufficient to throw him off his guard and excuse his negligence, if any, in not reading the instrument. *Butler v. Fertilizer Works, supra; Engle v. American Car & Foundry Co.,* 287 S. W., 801; *Union Pac. Ry. Co. v. Harris,* 158 U. S., 326, 39 L. Ed., 1003; *St. Louis I. M. & S. Ry. Co. v. Smith,* 100 S. W., 884; *Armstrong v. Steel Co.,* 268 S. W., 386; *Hot Springs Ry. Co. v. McMillan,* 88 S. W., 846; Anno. 134 A. L. R., 61.

In the absence of a showing that he was fraudulently misled or misinformed as to its nature or contents, or they are kept from him in fraudulent opposition to his request, a party to a written contract is deemed to have signed with full knowledge and is bound by the terms of the instrument he has executed. *Williams v. Williams,* 220 N. C., 806, 18 S. E. (2d), 364. But a party who is guilty of fraud in the procurement of the execution of a contract "shall not be allowed to cry 'negligence' as against his own deliberate fraud." *Linington v. Strong,* 107 Ill., 295 (p. 302); *Furst v. Merritt,* 190 N. C., 397, and cases cited.

On this record Barnett, after the "release" was executed, continued to "string him along" and lull him into a false sense of security. Plaintiff repeatedly interviewed him after his first operation relative to pay for

loss of time and Barnett told him ". . . just carry out his (Dr. McKenzie's) orders.  I will get you some money . . . that it took time—that they were a big Company and busy, and were not as hasty as we might think they ought to be but just rest assured that he would take care of that part of it for me . . . one thing that was slowing them up was the fact that the injury wasn't well . . . I was under Dr. McKenzie's orders, go right ahead, and that I would get pay for additional loss of time . . . I was needing money, wanting money and he promised me money.  Mr. Barnett agreed with me. . . . He said he was just waiting for the officials to send it."  Just before the fourth operation "I told him that I had to have money—that my family did.  He said he would write them immediately and was sure he would get action . . . he would mail the check to me or take it out to the house so my family would have some money to get by on while I was in the hospital.  Mr. Barnett said surely this operation would cure me and make it possible so that they could settle up—*maybe they didn't want to settle in part."*  (Italics supplied.)

It was not until after the fourth operation that a release was mentioned.  Barnett then said he agreed with plaintiff about the loss of time "but that the officials in Washington were of another opinion because of the fact that I had signed a release before the first operation.  Then I did blow up.  I said, you mean to say that form I signed to get in the hospital was a release and he said well, yes, sir, in a round-about way it was, that it released the Company from all except doctor and hospital bills and that they didn't feel that they should do any more because you signed the release . . . it wasn't his decision, it was theirs."

He declined any further hospitalization after he was thus advised the paper writing was a release.

All this testimony respecting conversations between plaintiff and Barnett after the execution of the release, in my opinion, was admissible not only in corroboration of plaintiff's testimony concerning the circumstances under which the instrument was executed, but also as tending to establish Barnett's fraudulent intent.

It is true plaintiff had legal advice before his fourth operation, but he "was assured (by counsel) that everything was all right; that Mr. Barnett was handling the matter for me, and he readily agreed I had money coming."  Surely this did not put plaintiff on guard to the extent that his acceptance of hospitalization thereafter constitutes a ratification of the release as actually signed by him.

While this evidence concerning legal advice, except the bare statement that he had legal advice before he went through the fourth operation, was excluded, I am of the opinion this was error.  Surely, if proof of the fact he consulted counsel is admissible as tending to show notice and ratification, he was entitled to give evidence as to the advice received so as to rebut the adverse implications.

As I am of the opinion the record discloses evidence of negligence and of fraud in the *factum* sufficient to vitiate the release, I vote to reverse. DEVIN and SEAWELL, JJ., concur in dissent.